# In the United States Court of Federal Claims

No. 20-946C

(E-filed:  November 20, 2020)[1]

| | |
|---|---|
| SUMMIT TECHNOLOGIES, LLC,    )<br><br>Plaintiff,    )<br><br>v.    )<br><br>THE UNITED STATES,    )<br><br>Defendant.    ) | Pre-Award Bid Protest; Motion for Judgment on the Administrative Record; Agency Discretion; Unstated Evaluation Criteria. |

Theodore P. Watson, Aurora, CO, for plaintiff.

Evan Wisser, Trial Attorney, with whom appeared Jeffrey Bossert Clark, Acting Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Frank V. DiNicola, Desiree A. DiCorcia, and Tara Nash, Department of Veterans Affairs, of counsel.

OPINION

CAMPBELL-SMITH, Judge.

On July 31, 2020, plaintiff filed its complaint in this pre-award bid protest, which challenges the Department of Veterans Affairs' (VA) decision to exclude plaintiff from the competitive range in a procurement for information technology (IT) services.[2]  See

---

[1] This opinion was issued under seal on November 18, 2020.  See ECF No. 36.  The parties were invited to identify any competition-sensitive or otherwise protectable information subject to redaction.  The parties' proposed redactions were acceptable to the court.  See ECF No. 37.  All redactions are indicated by brackets ([ ]).

[2] Barbaricum, LLC, a second unsuccessful offeror, filed a protest action that was consolidated with this case on August 12, 2020.  See ECF No. 12 (consolidation order). Barbaricum, however, filed a notice of voluntary dismissal on September 1, 2020.  See ECF No. 25.

ECF No. 1 (complaint).  On September 2, 2020, plaintiff filed a motion for judgment on the administrative record (AR), ECF No. 26; and on September 23, 2020, defendant filed a cross-motion for judgment on the AR, ECF No. 27.

In ruling on the motions, the court has considered:  (1) plaintiff's complaint, ECF No. 1; (2) the AR, ECF No. 14;[3] (3) plaintiff's motion for judgment on the AR, ECF No. 26; (4) defendant's cross-motion for judgment on the AR and response to plaintiff's motion, ECF No. 27; (5) plaintiff's reply in support of its motion and response to defendant's cross-motion, ECF No. 28; and (6) defendant's reply in support of its cross-motion, ECF No. 29.

For the following reasons, plaintiff's motion for judgment on the AR is **DENIED**, and defendant's cross-motion for judgment on the AR is **GRANTED**.

I.      Background

A.      The Solicitation

On November 12, 2019, the VA issued solicitation number 36C10B19R0046, for IT services as part of the Transformation Twenty-One Total Technology Next Generation (T4NG) On-ramp program (the solicitation).[4]  See ECF No. 14-2 at 260.  The solicitation explained the scope of the procurement, as follows:

> The Contractor shall provide total IT services solutions including the following functional areas:  program management, strategy, enterprise architecture and planning; systems/software engineering; software technology demonstration and transition; test and evaluation; independent verification and validation; enterprise network; enterprise management framework; operations and maintenance; cybersecurity; training; IT facilities; and other solutions encompassing the entire range of IT and Health IT requirements, to include software and hardware incidental to the solution.

---

[3]     When defendant initially filed the administrative record (AR), the certification from the contracting officer was not signed.  See ECF No. 14-1 at 16.  Upon discovering this error, defendant filed a consent motion to correct the AR, ECF No. 17, and attached a corrected certification with the proper signature, ECF No. 17-1.  The court granted the motion to correct the AR, and directed defendant to file a supplement to the AR "attaching the digitally signed contracting officer's certification."  ECF No. 19 at 1 (order).  Defendant filed the supplement with the properly signed certificate on August 17, 2020.  See ECF No. 23.

[4]     The copy of the solicitation included in the AR is not dated, but the index filed by defendant, see ECF No. 14-1 at 2, and presentation slides from the Source Selection Advisory Counsel's May 27, 2020 initial evaluation briefing, see ECF No. 14-7 at 418, indicate that the solicitation was issued on November 12, 2019.

Accordingly, Task Orders may include acquisitions of software and IT products . . . .  These services, as well as related IT products, may encompass the entire life-cycle of a system.  Moreover, services and related products covered under this contract shall be global in reach and the Contractors must be prepared to provide services and deliverables worldwide.

Id. at 271.

The procurement provides for a five-year contract base period and one five-year option period, with a maximum value of $22.3 billion.  See id. at 2, 266, 275.  Under the solicitation, the "VA assigns contract tasks to the prime contractors through competitively awarded task orders including some task orders set aside for the [Service-Disabled Veteran-Owned Small Businesses (SDVOSBs)]."  ECF No. 27 at 7 (citing ECF No. 14-2 at 303-08, 341).  The solicitation was intended to "replenish the pool of SDVOSB prime contractors under the contract, anticipating that several incumbent SDVOSBs would no longer qualify at the end of the five-year base period."  Id. at 8 (citing ECF No. 14-2 at 16).

The solicitation also explains that "[t]his competition is being conducted pursuant to the on-ramp clause of the T4NG basic contract.  The Government intends to award seven (7) contracts to verified [SDVOSBs]."  ECF No. 14-2 at 391.  The VA, however, reserves the right to adjust that number in its discretion.  See id.  Awards will be made on a best-value basis, considering five evaluation factors, including "Technical, Past Performance, Veterans Employment, Small Business Participation Commitment Factor (SBPC), and Price."  Id.  Those factors will be valued as follows:

The Technical Factor is significantly more important than the Past Performance Factor, which is slightly more important than the Veterans Employment Factor which is slightly more important than the SBPC Factor, which is slightly more important that the Price Factor.  The Technical Factor has two (2) Sub-factors:  Sample Task Sub-Factor and Management Sub-factor.  Within the Sample Task Sub-factor, Sample Task 1 and Sample Task 2 are equally important.  The Sample Task Sub-factor is significantly more important than the Management Sub-factor.  All non-price factors, when combined, are significantly more important than the Price Factor.  To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the Technical Factor, all Technical Sub-factors, and the SBPC Factor.  Offerors are cautioned that the awards may not necessarily be made to the lowest Price offered or the most highly rated technical proposals.

Id.

3

In order to promote an efficient evaluation process, "the evaluation will be conducted in two phases, Step One and Step Two." Id. For Step One, the offerors were directed to submit a technical proposal and price proposal responding to Sample Task 1. See id. at 391-92. Following an evaluation of the Sample Task 1 response, the VA would establish a competitive range, and select the offerors eligible to proceed to Step Two. See id. at 391. Offerors that do not advance to Step Two are excluded from the competition. See id. at 392.

The sample tasks were intended to test the "Offeror's expertise and innovative capabilities to respond to the types of situations that may be encountered in performance of a contract resulting from this solicitation." Id. at 393. For this reason, "the Offerors [were not] given an opportunity to correct or revise a sample task response." Id. Responses to the sample tasks were evaluated in accord with the following:

> (1)    Understanding of Problems—The proposal will be evaluated to determine the extent to which the Offeror demonstrates a clear understanding of all features involved in solving the problems and meeting the requirements presented by the Sample Task; and the extent to which uncertainties are identified and resolutions proposed.

> (2)    Feasibility of Approach—The proposal will be evaluated to determine whether the Offeror's methods and approach to meeting the Sample Task requirements provides the Government with a high level of confidence of successful completion.

Id. And, considering the foregoing criteria, each sample task response was assigned one of the following overall adjectival ratings:

> a.    Outstanding—A proposal that meets or exceeds all of the Government's requirements, contains extensive detail, demonstrates a thorough understanding of the problems, and is highly feasible (low risk).

> b.    Good—A proposal that meets or exceeds all of the Government's requirements, contains at least adequate detail, demonstrates at least an understanding of the problems, and is at least feasible (low to moderate degree of risk).

> c.    Acceptable—A proposal that at least meets all of the Government's requirements, contains at least minimal detail, demonstrates at least a minimal understanding of the problems, and is at least minimally feasible (moderate to high degree of risk).

> . . . .

4

e.      Unacceptable—A proposal that contains a major error(s), omission(s), or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements or involves a very high risk; and none of these conditions can be corrected without a major rewrite or revision of the proposal.  A proposal that fails to meet any of the Government's requirements after the final evaluation shall be ineligible for award regardless of whether it can be corrected without a major rewrite or revision of the proposal.

ECF No. 14-6 at 435 (subsection d is omitted because it is inapplicable to evaluations of Sample Tasks); ECF No. 14-7 at 422.  With regard to the price proposals, the VA intended to verify each offeror's calculations and "evaluate each proposed labor rate to determine whether it is unrealistically low in order to measure performance risk."  ECF No. 14-2 at 395.

    B.      Sample Task 1

In Sample Task 1, the VA sought responses to the following hypothetical scenario:

The U.S. Department of Veterans Affairs (VA) signed a multi-year contract to modernize its electronic health record (EHR) system and to replace its legacy Veterans Information Systems and Technology Architecture (VISTA) system.  VA's infrastructure/Information Technology (IT) components will need to be analyzed, reported, prioritized, remediated, and tracked to prepare VA for the new EHR system.  Using the T4NG Performance Work Statement, describe in detail your approach to analyze, remediate, and report VA infrastructure/IT deficiencies across the organization to prepare VA facilities for the new EHR system.

Id. at 458.  The language of Sample Task 1 incorporated by reference the requirements included in the performance work statement (PWS), which is part of the solicitation.  See id. at 267-313.  The VA gave offerors seven business days to submit their responses, which were limited to a maximum of twenty-five pages.  See id. at 382.

    To assist in evaluating the Sample Task 1 responses, the VA "prepared a 'Government developed solution' as a benchmark against which to evaluate offerors' understanding of the problem and feasibility of their approach."  ECF No. 27 at 10 (citing ECF No. 14-7 at 170).  In developing this evaluation tool, the VA:

identified five relevant high level focus areas that a competent offeror should understand would need to be addressed, based upon the contractor responsibilities described in the PWS:  (1) enterprise high level planning ([ ]

5

> ECF No. 14-2 at 285-88); (2) analyze/remediate network deficiencies ([ ]
> ECF No. 14-2 at 292-93); (3) analyze/remediate infrastructure deficiencies
> ([ ], ECF No. 14-2 at 297-98); (4) analyze/remediate IT component
> deficiencies ([ ], ECF No. 14-2 at 296-97; [ ], ECF No. 14-2 at 290); and (5)
> reporting ([ ] ECF No. 14-2 at 285-88; [ ] ECF No. 14-2 at 308-12).

ECF No. 27 at 10-11 (citing ECF No. 14-7 at 170; ECF No. 14-7 at 424).  The VA also
identified secondary, or lower level, areas of focus "drawn from the PWS."  Id.

The Sample Task 1 responses were assigned strengths, weaknesses, or deficiencies
in each of the five high level focus areas, according to the following criteria:

> **Strength:**  Any aspect of a proposal that, when judged against a stated
> evaluation criterion, enhances the merit of the proposal or increases the
> probability of successful performance of the contract.

> **Significant Strength:**  Appreciably enhances the merit of a proposal or
> appreciably increases the probability of successful contract performance.

> **Weakness:**  A flaw in a proposal that increases the risk of unsuccessful
> contract performance.

> **Significant Weakness:**  A flaw that appreciably increases the risk of
> unsuccessful contract performance.

> **Deficiency:**  A material failure of a proposal to meet a Government
> requirement, or a combination of significant weaknesses in a proposal that
> increases the risk of unsuccessful contract performance to an unacceptable
> level.

ECF No. 14-7 at 425.  Strengths and weaknesses were assigned only for the high level
focus areas.  See id. at 424.

Plaintiff's response to Sample Task 1 was twelve pages long.  See ECF No. 14-4
at 296-310.  The source selection evaluation board (SSEB) assigned the technical
proposal two [ ] and three [ ], but no [ ].  See ECF No. 14-7 at 172-75.  The SSEB
discussed each high level focus area in detail when evaluating plaintiff's response, but its
concerns with the response related, in large part, to [ ] provided by plaintiff with regard to
a considerable number of issues.  See id.  For example, the [ ] lead the SSEB to conclude
that plaintiff's response relating to [ ] presented a [ ] which could lead to [ ].  Id. at 172-
73.

6

The SSEB concluded its evaluation of plaintiff's response to Sample Task 1 by addressing whether it demonstrated plaintiff's understanding of the problem presented, and the feasibility of its proposed approach:

> **Understanding of problem:**  Overall, the Offeror's proposal demonstrated [ ] of the features involved in solving the problems and meeting the requirements, as well as identifying uncertainties and proposing resolutions, presented by the sample task.

> **Feasibility of approach:** Overall the Offeror demonstrated an approach that [ ]. The Offeror's methods and approach provided the Government with [ ] in the Offeror's ability to execute the sample task.

> **Rating Rationale:**   Unacceptable—A proposal that contains a major error(s), omission(s) or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements or involves a very high risk; and none of these conditions can be corrected without a major rewrite or revision of the proposal.

Id. at 175.

With regard to plaintiff's price proposal, the SSEB found no mathematical errors, and concluded that the proposed labor rates were not unrealistically low.  See id. at 352-54.  Plaintiff's evaluated price was [ ].  See id. at 352.

C.      Competitive Range Determination

Of the [ ] evaluated proposals received by the VA, "[ ] proposals were rated 'Unacceptable;' [ ] proposals were rated 'Acceptable;' [ ] proposals were rated 'Good;' and [ ] proposals were rated 'Outstanding.'  The evaluated prices of the [ ] offerors ranged from a low of [ ] to a high of [ ]."  Id. at 553.   In determining the competitive range, the source selection authority (SSA) excluded all offerors with "Unacceptable" Sample Task 1 ratings, which included plaintiff.  Id.  The SSA determined that excluding the [ ] unacceptable proposals was appropriate because "Sample Task 1 was significantly more important than Price."  The SSA also noted that "there was ample competition among Offerors with 'Acceptable' or better technical proposals with low evaluated prices."  Id. at 554.  The contracting officer concurred with the SSA's conclusion.  See id.

II.     Legal Standards

A.      Bid Protests

In its complaint, plaintiff invokes this court's bid protest jurisdiction.  See ECF No. 1 at 15-16.  This court's bid protest jurisdiction is based on the Tucker Act, which gives the court authority:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1).  The Tucker Act also states that the court may grant "any relief the court considers proper . . . including injunctive relief."  28 U.S.C. § 1491(b)(2).

The court's analysis of a "bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the court determines, pursuant to the Administrative Procedure Act standard of review, 5 U.S.C. § 706, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)).  If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial.  See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'"  Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors.  See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.").  But plaintiff must, at minimum, show that "had the alleged errors been cured, . . . 'its chances of securing the contract [would have] increased.'"  Precision Asset Mgmt. Corp. v. United States, 125 Fed. Cl. 228, 233 (2016) (quoting Info Tech., 316 F.3d at 1319).

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential."  Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  As the Supreme Court of the United States has explained, the scope of review under the "arbitrary and capricious" standard is narrow.  See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974).  "A

reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and "[t]he court is not empowered to substitute its judgment for that of the agency.'" Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) (stating that under a highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

B.      Permanent Injunctive Relief

As the United States Court of Appeals for the Federal Circuit has held:

> In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).

III.    Analysis

According to plaintiff, "the VA's decision to exclude it from competition is flawed and unreasonable," because the VA evaluated offerors "based on criteria that [were] not stated in the [s]oliciation," and it "failed to consider [plaintiff's] price." ECF No. 26 at 22. Specifically, plaintiff claims that the solution and evaluation framework developed by the VA for Sample Task 1 "conflicts with its published [s]olicitation," and amounted to "undisclosed criteria [that] used pre-determined focus areas or criteria to rate on several select key areas." Id. (citation omitted). As a result, plaintiff argues that the VA's evaluation "denied [plaintiff] the opportunity to be fairly evaluated[, and] violated the fundamental procurement principle of full and open competition under the Competition in Contracting Act of 1984." Id. (citing 41 U.S.C. § 3301). The court will address each of plaintiff's arguments, in turn.


A.      The VA's Evaluation Was Consistent with the Solicitation Terms

Plaintiff argues that the VA departed from the solicitation terms in five respects when evaluating plaintiff's proposal: (1) by concluding that plaintiff's response was unacceptable under the applicable adjectival rating definitions; (2) by using the term

"Enterprise High Level Planning" in the evaluation documents; (3) by not crediting plaintiff's proposal on the issue of "analyzing and remediating the [Heating, Ventilation, and Air Conditioning (HVAC)] infrastructure deficiencies of a VA facility;" (4) by requiring the use of specific keywords in evaluating the IT infrastructure proposal; and (5) by expecting plaintiff to discuss labor mix, which was not explicitly required by Sample Task 1.[5]  See id. at 25-30; 34-36.

       1.      The VA Did Not Abuse Its Discretion in Rating Plaintiff's Response as Unacceptable

As an initial matter, plaintiff claims in argument throughout its briefs that the VA failed to properly apply the solicitation's evaluation criteria when it rated plaintiff's proposal as unacceptable.  Plaintiff argues that had the VA properly applied the ratings set out in the solicitation, it would have been rated as acceptable, and therefore, included in the competitive range.  See, e.g., ECF No. 26 at 31-32; ECF No. 28 at 19-26, 29.

Acceptable and unacceptable proposals are defined, as follows:

c.      Acceptable—A proposal that at least meets all of the Government's requirements, contains at least minimal detail, demonstrates at least a minimal understanding of the problems, and is at least minimally feasible (moderate to high risk).

. . . .

e.      Unacceptable—A proposal that contains a major error(s), omission(s), or deficiency(ies) that indicates a lack of understanding of the problems or an approach that cannot be expected to meet requirements or involves a very high risk; and none of these conditions can be corrected without a major rewrite or revision of the proposal.  A proposal that fails to meet any of the Government's requirements after the final evaluation shall

---

[5]     Plaintiff's motion includes two sections that are not separately addressed in the court's analysis.  First, in section VI.A., plaintiff argues that the VA was wrong to evaluate plaintiff's Sample Task 1 response as lacking detail, and that the VA improperly assessed the risk of plaintiff's response.  See, e.g., ECF No. 26 at 30-33.  In this section, plaintiff admittedly reiterates or repackages arguments it makes elsewhere.  See id. at 31 (plaintiff citing to the first three sections of its own argument).  Because the court addresses such criticisms of the VA's exercise of discretion at multiple points in its analysis, it need not repeat that analysis for the purpose of following the structure of plaintiff's argument.  And second, in section VI.C., plaintiff argues that the VA's use of unstated evaluation criteria prejudiced offerors not currently working with the agency.  See id. at 36-38.  As discussed below, however, the court concludes that the VA did not use unstated criteria in its evaluation.  Accordingly, no discussion about the affect of unstated evaluation criteria is necessary.

be ineligible for award regardless of whether it can be corrected without a
major rewrite or revision of the proposal.

ECF No. 14-6 at 435; ECF No. 14-7 at 422.

Plaintiff's argument is not a model of clarity.  But to the extent a cogent argument
can be discerned, it appears to be this:  "The definition of 'acceptable' specifically allows
for the very lack of detail that the VA continues to argue about in its motion."  ECF No.
28 at 21 (citation omitted).  As a result, plaintiff's logic suggests, the VA could not
properly base its unacceptable rating on the fact that plaintiff included minimal detail in
its proposal.  See id. at 23, 26.

In taking this position, however, plaintiff overlooks three important points.  First,
the definition of acceptable requires "at least minimal detail," but does not guarantee that
all responses that include minimal detail will be deemed acceptable.  ECF No. 14-7 at
422 (emphasis added).  Put another way, minimal detail is necessary, but not clearly
sufficient, to reach the acceptable level.  In addition, the VA repeatedly found that
plaintiff's response "[ ]."  See ECF No. 14-7 at 172-75.  The fact that the VA assessed the
response to [ ] is consistent with the conclusion that it "contains . . . [ ].  See ECF No. 14-
7 at 422.  And finally, the VA determined that plaintiff's response presented a [ ] or a [ ]
to successful performance.  Id. at 172-75.  Very high risk proposals are deemed, under
the plain language of the adjectival rating definitions, to be unacceptable.  See ECF No.
14-7 at 422.  Accordingly, the court does not credit plaintiff's argument on this point.

2.    The VA's Use of the Term "Enterprise High Level Planning" Is Not
Contrary to the Solicitation

In order to assist in the evaluation process, the VA developed a government
solution to Sample Task 1.  In the initial evaluation report, the VA explained:

The Government solution to Sample Task 1 included necessary analysis,
remediation, and reporting efforts in the areas of Enterprise High Level
Planning; Analyze/Remediate Network Deficiencies; Analyze/Remediate
Infrastructure Deficiencies; Analyze/Remediate IT Component Deficiencies;
and Reporting.

ECF No. 14-7 at 170.  Plaintiff contends that because the phrase "Enterprise High Level
Planning" does not appear in the solicitation, the use of the phrase in the evaluation
documents amounts to an unstated evaluation criterion.  See ECF No. 26 at 25-27.
Plaintiff acknowledges that other related terms appear in the solicitation, such as
"Enterprise and IT Framework" and "Enterprise Management Framework," but argues
that the concept of "Enterprise High Level Planning" introduces an entirely new

requirement and that "there was no way [plaintiff] was on notice to meet the VA's expectations." Id. at 26.

In response, defendant explains that the "PWS informed offerors that they would be required to provide enterprise planning services as part of their contract performance." ECF No. 27 at 21.  Defendant cites directly to the PWS in support of this assertion.  The PWS identifies "Program Management, Strategy, Enterprise Architecture and Planning Support" as the first functional area requirement that any task order issued under the contract may encompass.  See ECF No. 14-2 at 285.  The PWS further states that offerors may be required to provide "enterprise architecture and planning support on an enterprise or individual project level."  Id.  As examples of the functions a successful offeror may be expected to perform, the PWS lists:  project planning, schedule management, financial management, earned value management, quality management, resource management, requirements management, communications management, project change management, organization change management, risk management, performance management, and knowledge management.  See id. at 287.  According to defendant, these responsibilities are "enterprise planning elements [that] were disclosed in the PWS."  ECF No. 27 at 21.

Defendant also points out that, while it titled one of the high level focus areas "Enterprise High Level Planning," that was an umbrella term for the explicit requirements of the PWS, and it did not "fault offerors for failing to use this exact language, and rationally focused on the extent to which offerors demonstrated an understanding of the requirements and proposed a feasible approach related to enterprise high level planning."  Id. (citing ECF No. 14-2 at 651-77; ECF No. 14-7 at 26-27 (awarding an offeror a "significant strength" for enterprise high level planning even though offeror did not use that phrase in its response)).

Plaintiff argues, in its reply, that while it "is well aware that the [VA] is not required to present its entire Source Selection Plan to the public, . . . the issue in this case is that the VA used a significantly different basis in evaluating the proposals than was disclosed in the solicitation."  ECF No. 28 at 23.  According to plaintiff, "the VA used one paragraph to cast an incredibly wide net, requesting offer[or]s to decide for themselves what issues they would address that may arise from performing the entire PWS."  Id.  Plaintiff suggests that this approach was unfair, but as defendant notes in its reply, this was the stated purpose of the sample task—to 'test the Offeror's expertise,'" and their "ability to determine which PWS elements were relevant to the sample task." ECF No. 29 at 3-4 (citing ECF No. 14-2 at 189, 393).

It is, of course, true that an agency cannot evaluate proposals on the basis of unstated criteria.  See Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) (stating that "agencies must evaluate proposals and make awards based on the criteria stated in the solicitation").  It is equally true, however, that "a solicitation need not identify criteria intrinsic to the stated

evaluation factors, and agencies retain great discretion in determining the scope of a given evaluation factor." PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 536 (2010) (quotation marks and citation omitted).   To prevail on its claim that the VA impermissibly used unstated evaluation criteria, plaintiff must show that: (1) "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed," and (2) "the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error." NEQ, LLC v. United States, 88 Fed. Cl. 38, 48 (2009) (quoting Banknote, 56 Fed. Cl. at 387).

Here, plaintiff fails on the first part of the analysis.  A fair reading of the AR indicates that the VA's substantive evaluation criteria reviewed under the heading "Enterprise High Level Planning" were included in the description of Sample Task 1 or in the PWS, which was incorporated by reference. See ECF No. 14-2 at 458.  The VA's evaluation of plaintiff's Sample Task 1 noted that plaintiff's response [ ] in its approach to [ ]." ECF No. 14-7 at 173.  More specifically, the VA found that plaintiff's response [ ] on [ ]," [ ] to [ ]" "[ ] and [ ] in its approach to []." Id. at 173-74.

Each of these areas identified by the VA as weaknesses in plaintiff's response logically correlate to the list of examples in the PWS of responsibilities a successful offeror would need to perform. See ECF No. 14-2 at 287.  For example, the PWS specifically states that offerors should be prepared to perform project planning, schedule management, resource management and performance management. Id.  In the court's view the terms by which the VA evaluated plaintiff's Sample Task 1 response are not "significantly different" from the disclosed criteria, and therefore, are not undisclosed. NEQ, 88 Fed. Cl. at 48.

3.   The VA Reasonably Addressed the HVAC Requirements in Evaluating Plaintiff's Sample Task 1 Response

Plaintiff next argues that the VA was wrong to assign it a weakness for "'[ ].'" ECF No. 26 at 28 (quoting ECF No. 14-7 at 171).  Plaintiff claims that it addressed "additional temperature control and air handlers to cool hardware," but should not have been expected to address the HVAC system needs more broadly. Id.  The PWS, however, clearly indicates that contractors may be responsible for "air-conditioning equipment, building [HVAC]," and data center "power and cooling analysis." ECF No. 14-2 at 296.  The language of the PWS is broad, and can fairly be read to encompass more than plaintiff suggests.

Considering the foregoing, it appears to the court that plaintiff's challenge on this point amounts to a disagreement with the VA's conclusion about plaintiff's Sample Task 1 response.  A review of the evaluation document indicates that the VA considered the relevant factors—the terms of the solicitation and plaintiff's Sample Task 1 response—in assigning plaintiff a weakness for this aspect of its response. See ECF No. 14-7 at 172-

13

73.  The VA's discussion is detailed and reasoned.  As such, "'[t]he court is not empowered to substitute its judgment for that of the agency.'"  Bowman Transp., 419 U.S. at 285 (quoting Citizens to Preserve Overton Park, 401 U.S. at 402); see also Weeks Marine, 575 F.3d at 1368-69 (stating that under a highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

> 4.      The VA Did Not Perform Its Evaluation Based on Keywords

Plaintiff next argues that the VA's evaluation of its response relating to testing IT infrastructure was improper.  Plaintiff claims that its "proposal provided extensive detail on how it would [ ]."  ECF No. 26 at 29 (citation omitted).  According to plaintiff, "the VA determined that there was a lack of detail [in plaintiff's Sample Task 1 response] because the proposal did not use keywords such as 'wiring and racks' and 'LAN connected end user devices (EUDs).'"  Id. (citation omitted).

The record does not support plaintiff's position.  The court will quote the evaluation document at length to demonstrate this point.  In the evaluation document, the VA states:

> [ ].

> . . . .

> [ ].

ECF No. 14-7 at 172-73.  The court sees no indication in this passage that the VA was looking for specific keywords as a basis for its evaluation.  The VA does use the terms highlighted by plaintiff, but those terms appear as part of a reasoned explanation of why plaintiff's proposal was assigned a weakness in this area.  Moreover, those terms are included in the PWS.  See, e.g., ECF No. 14-2 at 297-98 (requiring design, installation and modification services including the installation of "fiber optic cabling [and] racks"); id. at 293 (requiring "services related to . . . LAN and WAN systems and components," including routers and switches); id. at 290 (requiring EUD services).

The court again concludes that plaintiff's challenge on this point amounts to a disagreement with the VA's conclusion that plaintiff's Sample Task 1 response was unacceptable.  Because the VA considered the relevant factors and provided a reasoned basis for its conclusion, the court will not substitute its judgment for the agency's.  See Bowman Transp., 419 U.S. at 285 (quoting Citizens to Preserve Overton Park, 401 U.S. at 402); see also Weeks Marine, 575 F.3d at 1368-69 (stating that under a highly deferential rational basis review, the court will "sustain an agency action 'evincing

14

rational reasoning and consideration of relevant factors'") (citing <u>Advanced Data Concepts</u>, 216 F.3d at 1058).

>
>         5.      The VA Did Not Evaluate Plaintiff's Proposed Labor Mix in Its
>                 Sample Task 1 Response

Plaintiff claims the VA improperly criticized its failure to address its proposed labor mix in its Sample Task 1 response.  <u>See</u> ECF No. 26 at 34.  Plaintiff cites the following statements from the VA's evaluation of its response in support of its argument:

>         [ ].

ECF No. 14-7 at 173.  According to plaintiff, this evaluation was improper because "[n]either the sample task, nor the solicitation provide any instructions calling for offerors to discuss the labor mix it plans to use in response to [Sample Task 1]."  ECF No. 26 at 34.

In response, defendant explains that the "VA did not evaluate [plaintiff's] labor mix, but faulted [plaintiff] for its failure to [ ]."  ECF No. 27 at 24-25.  This criticism was based on plaintiff's failure to address the PWS requirement for "offerors to provide appropriate personnel for specific tasks."  <u>Id.</u> at 25.  The PWS states:  "The Contractor shall provide the personnel, . . . necessary to model, simulate, and/or analyze IT services, systems, networks and other infrastructure or IT components in operation in the computing environment or under development."  ECF No. 14-2 at 290.

Plaintiff insists in its reply that "the VA did in fact assess the labor mix and types of personnel proposed, . . . an assessment [that] was actually required in step two and not [Sample Task 1]."  ECF No. 28 at 32 (citation omitted).  Defendant counters, however, that "'[l]abor mix' is an invention of [plaintiff's] brief, not an evaluation criterion identified anywhere in the solicitation."  ECF No. 29 at 6 (citing ECF No. 14-2 at 260-395).  Defendant then explains that in step two the VA will not evaluate labor mix, but will evaluate the way in which offerors proposed to divide work "among the offeror and its subcontractors and how the offeror would intend to retain its workforce."  <u>Id.</u> (citing ECF No. 14-2 at 386).

The court finds that the VA's decision to assign plaintiff a weakness for [ ] is fairly based on language in the PWS requiring offerors to "provide appropriate personnel for specific tasks."  ECF No. 14-2 at 290.  The VA did not base its assessment on plaintiff's plans for subcontractor employment or workforce retention, the subjects addressed in Step Two of the evaluation process.  Plaintiff is simply incorrect to suggest otherwise.

15

B.      The VA Considered Plaintiff's Proposed Price as Required by the
        Solicitation

Finally, plaintiff argues that the VA "failed to consider price in accordance with
the stated evaluation criteria as set forth in the solicitation, and instead substituted [its]
own undisclosed evaluation criteria."  ECF No. 26 at 42.

The relevant portion of the solicitation states that the VA "will verify the Offeror's
calculation of the total evaluated price," and "will adjust the Offeror's proposed total
evaluated price if mathematical errors are identified."  ECF No. 14-2 at 395.  In addition,
the VA "will evaluate each proposed labor rate to determine whether it is unrealistically
low in order to measure performance risk.  The [VA] will not accept any unrealistically
low labor rates on contract."  Id.  The record demonstrates that the VA adhered to these
criteria, verifying that:  (1) plaintiff "priced all of the [VA's] provided labor hours," (2)
plaintiff's "labor dollars and calculations [included] no mathematical errors," and (3)
plaintiff's labor rates were not "unrealistically low."  ECF No. 14-7 at 352-54.  As a
result, plaintiff's total proposed price was not changed.  See id.

Particularly given the fact that the VA found no errors in, and made no changes to,
plaintiff's proposed price, the nature of plaintiff's complaint on this point is unclear.  The
record demonstrates that the VA evaluated plaintiff's price for accuracy and
reasonableness, precisely as stated in the solicitation.  Plaintiff's suggestion to the
contrary is unavailing.

It appears to the court that plaintiff may mean to argue that the VA should have
considered whether plaintiff's price proposal was sufficiently low that it would outweigh
the fact that its offer was deemed unacceptable, but failed to do so.  See ECF No. 26 at
43.  This assertion, however, is belied by the record.  In making the competitive range
determination, the SSA:

> considered the detailed findings of the SSEB as presented to her on May 27,
> 2020 for Step One (i.e. Sample Task 1 and price), . . . [and] determined to
> exclude Offerors who received a rating of "Unacceptable" for Sample Task
> 1 from the competitive range, as they are not among the most highly rated
> proposals. . . .   As set forth in the solicitation, Sample Task 1 was
> significantly more important than Price, and revisions are not permitted for
> sample task proposals.  In addition, the SSA considered the fact that while
> some of the "Unacceptable" Offerors proposed lower evaluated prices than
> other Offerors with superior technical proposals, the SSA determined that
> none of these Offerors proposed a price low enough to outweigh the
> "Acceptable" or better ratings received for Sample Task 1 by the Offerors
> remaining in the competitive range. . . .  Therefore, the SSA determined that
> no Offeror that received a rating of "Unacceptable" for Sample Task 1 had

> an evaluated price low enough to consider the Offeror amongst the most
> highly rated proposals.

ECF No. 14-7 at 553-54.  Plaintiff's proposal was, in fact, considered together with the
group of proposals deemed "Unacceptable" in the process of determining the competitive
range.  Thus, the facts in the record do not support plaintiff's argument that the VA failed
to include its price when determining the competitive range.

     C.    Plaintiff Is Not Entitled to Injunctive Relief

Plaintiff has not succeeded on the merits of its protest.  "Because proving success
on the merits is a necessary element for a permanent injunction," no injunctive relief is
warranted in this case.  Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 (Fed. Cir.
2018) (footnote omitted).  This protest must be dismissed.

IV.    Conclusion

Accordingly, for the foregoing reasons:

(1)    Plaintiff's motion for judgment on the AR, ECF No. 26, is **DENIED**;

(2)    Defendant's cross-motion for judgment on the AR, ECF No. 27, is
    **GRANTED**;

(3)    The clerk's office is directed to **DISMISS** plaintiff's complaint, and
    **ENTER** judgment, with prejudice, in defendant's favor; and

(4)    On or before **December 18, 2020**, the parties are directed to **CONFER** and
    **FILE** a **notice** informing the court as to whether any redactions are
    required before the court makes this opinion publicly available, and if so,
    attaching an agreed-upon proposed redacted version of the opinion.

IT IS SO ORDERED.

    s/Patricia E. Campbell-Smith
    PATRICIA E. CAMPBELL-SMITH
    Judge